1

2

3  **Randall K. Edwards PLLC**
Randall K. Edwards (**UBN** 3787)

4  136 S. Main Street, Ste 700
Salt Lake City, UT 84101

5  801-328-0300 (office)
801-328-4822 (fax)

6  randall@randallkedwards.com

7  **Jeanne D. Marshall PLLC**
Jeanne D. Marshall (**UBN 14999**)

8  136 S. Main, Suite 700
Salt Lake City, Utah  84101

9  801-328-4820 (office)
801-328-4822 (fax)

10  jeanne.d.marshall@gmail.com

11  Attorneys for PLAINTIFFS

12

13  **IN THE THIRD JUDICIAL DISTRICT COURT,**
**SALT LAKE COUNTY, STATE OF UTAH**

14

15  LORI GILBERT, as administrator of the Estate
of MICHAEL GILBERT, deceased; MARY

16  GILBERT, heir of MICHAEL GILBERT, by
and through her mother and natural guardian

17  LORI GILBERT; LORI GILBERT,
individually, as heir of MICHAEL GILBERT;

18  ALVIN GILBERT, individually, as heir of
MICHAEL GILBERT; MIKE E. GILBERT,

19  individually, as heir of MICHAEL GILBERT;
and SEAN GILBERT, individually, as heir of

20  MICHAEL GILBERT,

21          Plaintiffs,

22  v.

23  CEREAL FOOD PROCESSORS, INC., a
Kansas corporation; GRAIN CRAFT, INC., A

24  Georgia corporation; THYSSEN KRUPP CO.,
INC., a Delaware corporation; JOHN DOES 1

25  – 20; and BLACK AND WHITE

26  CORPORATIONS 1 – 20,

27          Defendants.

28

**COMPLAINT AND JURY DEMAND**
**(ERRATA)**
**(TIER 3)**

Case No.

Judge:

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE. 700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

Plaintiffs LORI GILBERT, as administrator of the Estate of MICHAEL GILBERT, deceased; LORI GILBERT, as mother and natural guardian of MARY GILBERT, heir of MICHAEL GILBERT; LORI GILBERT, individually, as heir of MICHAEL GILBERT; ALVIN GILBERT, individually, as heir of MICHAEL GILBERT; MIKE E. GILBERT, individually, as heir of MICHAEL GILBERT; and SEAN GILBERT, individually, as heir of MICHAEL GILBERT, hereby complain against Defendants, and each of them, as follows:

## PARTIES

1. Plaintiff LORI GILBERT is the widow of, and administrator of the Estate of, MICHAEL GILBERT, deceased, and represents the Estate of MICHAEL GILBERT, deceased, in that capacity.

2. Plaintiff MARY GILBERT is the daughter of, and heir of, MICHAEL GILBERT, deceased.  MARY is profoundly disabled, and her interests in this action are represented by her mother and natural guardian LORI GILBERT.

3. Plaintiff LORI GILBERT is the widow of, and an heir of MICHAEL GILBERT, deceased.

4. Plaintiff ALVIN GILBERT is a son of, and an heir of MICHAEL GILBERT, deceased.

5. Plaintiff MIKE E. GILBERT is a son of, and an heir of MICHAEL GILBERT, deceased.

6. Plaintiff SEAN GILBERT is a son of, and an heir of MICHAEL GILBERT, deceased.

7. CEREAL FOOD PROCESSORS, INC. (hereafter CFP) is, and at all times relevant hereto, was, a Kansas corporation with its main office located in Mission Woods, Kansas. At all times relevant hereto, CFP, either in its own name or in the name of GRAIN CRAFT, INC., operated grain milling operations in the State of Utah, in both Ogden and Salt Lake City.

8. In May, 2014, CFP was acquired by Milner Milling Co. and Pendleton Flour Mills, to create a new company, GRAIN CRAFT, INC.

9. The press release announcing the merger of Milner, Pendleton and CFP, dated 12 May 2014, stated, "The entire Grain Craft team is dedicated to long term customer relationships by continuously improving our responsiveness, flexibility and manufacturing excellence.

'All three companies have similar beliefs and philosophies about how to service the customer and how to do business; these core values will only grow stronger as we become one company,' says CEO, Charles Stout. We look forward to building on the tradition and heritage of all three of these great companies while creating a new leader in the flour milling industry."

10. GRAIN CRAFT, INC. is a Georgia corporation, with primary offices in Chattanooga Tennessee.

11. At all times relevant hereto, GRAIN CRAFT, INC. was the parent company of, affiliate of, subsidiary of, successor in interest of, or otherwise related to CFP, such that all actions undertaken by CFP and its representatives, agents, executives, supervisors or other personnel were, and are, the responsibility of GRAIN CRAFT, INC., thus rendering GRAIN CRAFT, INC. liable for all actions and claims set forth herein against CEREAL FOOD PROCESSORS.

12. On its website, GRAIN CRAFT, INC. states that "By uniting Cereal Food Processors, Milner Milling and PFM under the Grain Craft name, we've brought together three respected companies with rich milling histories.  Although their backgrounds and regions vary, each company shared core values about how to service your needs and how to conduct business the right way.  Today, these core values form the very foundation of Grain Craft."  It goes on to state, "At Grain Craft, we believe that people, not the building or equipment determine whether an organization will succeed.  Our culture is based on a high performance organization philosophy which cultivates an environment of achieving exceptional performance through the highest of expectations."

13. Defendant THYSSEN KRUPP ELEVATOR CORPORATION ("Thyssen Krupp") is a Delaware corporation doing business in the State of Utah.

## JURISDICTION AND VENUE

14. All acts complained of herein occurred in Salt Lake County, Utah.

15. Venue is proper before this court.

16. This case is classified under Tier 3.

- 3 -

**FACTS**

17. On Saturday, 2 August 2014, Michael, age 48, had worked for CFP for over 20 years.  To the degree that GRAIN CRAFT, INC. was the successor in interest of CFP at that date, Michael was an employee of GRAIN CRAFT, INC.  For purposes of this Complaint, however, all references to Michael's employment herein are based on the assumption that he was employed by CFP at the time of the relevant incident, and is drafted thus.  In the event that the recitation of this employment arrangement is incorrect, Plaintiffs will seek to amend this Complaint to so reflect the correct facts.

18. Those parties identified herein as JOHN DOES 1-20 and BLACK AND WHITE CORPORATIONS 1-20 are identified by fictitious names, but are believed by Plaintiffs to be in some way responsible for the matters complained of herein.  When the true names and identities of these parties is known, Plaintiffs will amend the Complaint to identify these parties by those true names.

**The incident.**

19. On 2 August 2014, Michael was on the second floor of the CFP Salt Lake City plant, moving pallets of malt from the second floor to the first floor, using a freight elevator.  He was working within the hours of his work and the ordinary spatial boundaries of his employment, and under the direct supervision of supervisors at CFP, as set forth herein.

20. This activity of moving product from floor to floor was not among Michael's normal job duties as a "bulk miller," although it was the general kind of activity that Michael had been employed to perform, which was to facilitate the operations of CFP's operations.  Michael's conduct was motivated entirely by the purpose of serving CFP's interests.  Michael had been assigned to undertake this product moving activity by his boss and supervisor, Dave Shomer, and/or other supervisors at CFP.

21. The employee Michael was assigned by Shomer, and/or other supervisors at CFP to assist was located on the first floor.

22. The elevator onto which the product was being loaded had been at the plant since 1923.

23. The elevator was an "open" type of elevator, with a chest-high (less than five feet) gate at

- 4 -

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

the front of the elevator which must be in place before the elevator can be actuated.

24. There was no gate or other bar above that level that would stand as a barrier for an employee to lean over into the elevator's operating space, even while the elevator is ascending or descending.

25. There was also no presence-sensing device or other sensor that might halt elevator operations in the event that an employee's body might be caught in an unsafe position on the elevator.

26. On 2 August 2016, the elevator was in violation of Federal and State safety standards, a condition known to Shomer and/or other supervisors at CFP.

27. At the time of Michael's death, CFP's standard operating procedure ("SOP") for the type of activity Michael was engaged in was for the employee on the second floor to load the elevator with the product, then to lower the elevator about half-way to the first floor, in order that the employee on the first floor is aware that the product has been loaded, in order that he (the first-floor employee) can lower the elevator the rest of the way.

28. At the time, the SOP at the CFP plant did not include telephonic or radio contact between the second-floor loader and the first-floor receiver that the elevator was safe to descend to the first floor.  Instead, the make-shift "procedure" of lowering the elevator halfway between the floors was the standard way in which the first-floor receiving employee was to know that full descent was to take place.

29. As part of this SOP, the first-floor employee cannot physically see the second-floor employee, nor can the second-floor employee see the first-floor employee.

30. There was no training on this SOP among CFP's employees, nor any manual or other written materials on the safety (and the lack thereof) and hazard aspects of this SOP. Instead, the SOP was simply a matter of custom among employees who generally worked this product transport process.

31. Michael was not among these employees.

32. The SOP was inherently extremely unsafe.

33. The SOP was virtually certain to cause injury and/or death to any employee acting in

- 5 -

accordance therewith, including Michael.

34. CFP, by and through its employees and supervisors, knew that the SOP was inherently unsafe and hazardous.

35. Dave Shomer, and/or other supervisors at CFP, Michael's immediate supervisor and boss, was aware of the fact that the SOP was inherently unsafe and knew and expected, when he assigned Michael to the task, that it was virtually certain that Michael would be injured or killed as a result thereof.

36. Shomer, and/or other supervisors at CFP, purposely, deliberately and intentionally, did not tell Michael of the unsafe and hazardous condition of the elevator and CFP's SOP.

37. In the incident that led to Michael's death, he, being unaware of the unsafe and hazardous condition of the elevator, as well as the unsafe and hazardous custom or SOP of the transport employees, and having received no training or instruction on the unsafe and hazardous condition of the elevator, as well as the unsafe and hazardous custom or SOP, and being unaware that his supervisor and boss, Shomer, and/or other supervisors at CFP, had assigned him to the task knowing and expecting that Michael would be injured or killed thereby as a result thereof, loaded the elevator with malt product and partially lowered the elevator, stopping it between the second and the first floors.  Unaware of the unsafe and hazardous condition of the elevator, as well as the unsafe and hazardous custom or SOP that this alone was the standard signal to the first-floor receiving employee that all employees on the second floor were clear of the elevator and that the elevator is now "safe" to descend, (as part of the SOP), Michael poked his head over the front gate, into the elevator space, to yell down to the receiving first-floor employee that the elevator was ready to be lowered.

38. At that point, the first-floor employee punched the button for the elevator to descend the rest of the way to the first floor.  Michael's head and upper body were caught between the top of the elevator and the gate as it descended, crushing his head and causing severe lacerations.

39. When Michael's predicament, and injuries, were discovered, he was immediately taken to

- 6 -

RANDALL K. EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

the University of Utah Medical Center, where, after 6 days on life support, he died.

**The blocked elevator "fail-safe":**

40. Despite the unsafe and hazardous condition of the elevator, and the obviously deficient, hazardous and unsafe SOP for moving product from the second floor to the first floor, there existed a "fail-safe" with regard to the elevator which, had it not been modified on specific order of CFP's "safety officer," would have resulted in a different outcome than Michael's death.

41. There exists a space of approximately three to four feet between the top of the elevator, when at its highest point, and the ceiling of the elevator shaft.  In order to utilize this space when necessary, among other uses, the ceiling of the elevator car is, in the state in which it was originally constructed, flexible, in that the front part of the top of the car (the half of the ceiling facing the front of the elevator, made of a metal mesh) can be opened.  By means of hinges placed in the middle of the ceiling, the front of the top can be pulled back, opening the ceiling.  This allows loads that are taller than the walls of the elevator, such as boards or other "overtall" loads, to be moved in the elevator, among other uses.

42. In the state of the elevator when it was originally constructed, even when the hinged portion has not been thrown back to make an open roof, the ceiling is not immovable, but is flexible, in that it can be thrown open, when needed for an overtall load or in order that a person somehow trapped in a stalled elevator could escape.

43. Thus, in a situation like the one faced by Michael, if the elevator had been in the state in which it had been originally constructed, even had Michael's head been inside the elevator and the hinged portion of the elevator roof had hit him in the head, that portion of the roof would have simply raised up, causing no damage, injury or death to Michael.  His head would not have been caught between the moveable and hinged elevator ceiling and the safety gate.

44. Prior to the incident that resulted in Michael's death, CFP's "safety officer," Bob Crandall, had instructed CFP staff to tack down and secure the roof by inserting two screws that held the ceiling immobile.  This resulted in taking away the flexibility of the

- 7 -

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

roof of the elevator, as described above, and configured it such that it could not be opened.

45. As a result of this modification of the elevator roof, when the roof of the elevator came into contact with Michael's head, the hinged ceiling could not open or even move, but instead caught him and crushed his head.

46. The "fail safe" was not safe at all.  It had been rendered unsafe and hazardous by CFP's own "safety officer."

47. The fact that this move on Mr. Crandall's part was extremely unsafe and hazardous, and caused a "pinch point" in the elevator, was well-known at CFP, and had been part of an ongoing discussion at CFP long before Michael's death.  There had been numerous conference calls about the fact that bypassing this safety measure would, with certainty, result in accident and injury.  Dave Shomer, and/or other supervisors at CFP, Michael's immediate boss and supervisor on the product moving job in which Michael was engaged in the incident that led to his death, had participated in these calls, and was aware that the elevator was unsafe and hazardous, and that it was a certainty that injury and/or death would result by an employee using the elevator in the hazardous state it was.

48. In assigning Michael to load product onto the elevator that he knew was unsafe, on Saturday, 2 August 2014, Dave Shomer, and/or other supervisors at CFP knew and expected that Michael would be injured or killed thereby.

49. Michael was never told by Dave Shomer, and/or other supervisors at CFP, Bob Crandall, or anyone else at CFP, that the elevator was unsafe or that the job to which he had been assigned on Saturday, 2 August 2014, was likely to injure or kill him.

**The aftermath of the incident:**

50. In violation of Utah Administrative Code, CFP did not report the incident within eight hours.

51. In addition, CFP did not place a "hold" on the incident scene, also as required under the Utah Administrative Code.

52. By the time that Utah OSHA investigated the scene, the elevator had been placed back into service, also in violation of the Utah Administrative Code.

- 8 -

53. After the incident that killed Michael, Dave Shomer, and/or other supervisors at CFP, Michael's boss and supervisor, instructed CFP employees to remove the screws in the elevator roof that had been installed at the behest of Bob Crandall, CFP's "safety officer." These actions of Shomer, and/or other supervisors at CFP, were a clear attempt to cover up the obviously dangerous condition caused when Crandall had sealed and rendered immobile the roof of the elevator with two screws, and to mislead OSHA officials into believing that the elevator roof had not been modified by CFP.

54. Additionally, Shomer, and/or other supervisors at CFP instructed CFP employees to tell OSHA officials that it was the elevator company and/or inspectors that had insisted that the two screws be placed on and in the elevator roof.  This was a flat-out lie.

55. The actions of Shomer, and/or other supervisors at CFP, as set forth in the two preceding paragraphs, were intended to mislead OSHA officials into believing that Shomer, and/or other supervisors at CFP did not intend, know or expect that Michael would be injured or killed as a consequence of the actions of Shomer, and/or other supervisors at CFP, in assigning Michael to the task of moving product, as set forth above.

56. OSHA officials investigated Michael's death and found CFP to be in "serious" violation of safety standards, which included "no guards to protect employees from the opening of the freight elevator (between the gate and the top of the elevator)" and "no presence sensing devices which would stop the elevator if something/someone were to be caught between the gate and the top of the elevator."

57. CFP did not contest the finding or the penalty assessed against it.

**Thyssen Krupp Elevator Corporation's inspections of the elevator.**

58. For a number of years prior to the incident that ultimately took Michael's life, CFP had had a contract with Thyssen Krupp Elevator Corporation to inspect the elevator and to notify CFP's staff of any and all safety and operation issues of the elevator.

59. Thyssen Krupp carried out various safety inspections up through 2013 on the elevator.

60. At the time that Thyssen Krupp carried out its safety inspections, its inspectors knew or should have known that the elevator was unsafe to be operated in the manner that CFP

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

personnel operated it as part of their SOP, as outlined above.

61.  Thyssen Krupp's investigators also knew or should have known that there were inadequate safety mechanisms attendant to the elevator, including, but not limited to:

- the failure of any barrier or gate above the chest-high level that would keep a person from placing his head or other body part into the elevator open space in such a way that it could become caught and entangled in a descending or ascending elevator;

- the lack of any presence-sensing device or other sensor that might halt elevator operations in the event that an employee's body might be inadvertently caught in an unsafe position on the elevator; and

- the fact that the hinged ceiling portion of the elevator had been screwed shut and thus created a "pinch point" in the event that a person from outside the elevator could trap his head or other body part in the event that it was caught in the event that the elevator ascended or descended while the person's body part was within the elevator space.

62.  Notwithstanding the knowledge of Thyssen Krupp's safety inspectors of the unsafe condition of the elevator, as used and as it had been modified, Thyssen Krupp did nothing to report, repair or otherwise remedy the unsafe condition of the elevator.

## FIRST CLAIM FOR RELIEF
## (AGAINST CFP AND GRAIN CRAFT)

63.  Plaintiffs hereby incorporate the averments of the foregoing paragraphs as though fully set forth at this point.

64.  CFP, by and through Michael's supervisor, David Shomer, and/or other supervisors at CFP, and others, knew, expected and desired that Michael, as a direct result of David Shomer, and/or other supervisors at CFP's actions, would be injured or killed by using the elevator on the day he was injured, and that such injury was certain to result as a consequence of the actions of David Shomer, and/or other supervisors at CFP.

65.  In this regard, CFP, through Michael's supervisor, David Shomer, and/or other

- 10 -

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

supervisors at CFP, as well as other supervisors, knew:

- That the elevator had inadequate safety mechanisms, including, but not limited to, the following:
  - the unsafe chest-high gate;
  - the fact that there existed no gate or other barrier to keep Michael from leaning into the elevator's operating space, even while the elevator was ascending or descending;
  - the lack of any presence-sensing device that would halt the elevator's operating in the event that Michael's body was in the elevator space;
  - the fact that the "fail-safe" open hinged ceiling on the elevator had been screwed shut by CFP's "safety officer";
  - that a "pinch point" existed on the elevator that would injure or kill anyone using the elevator according to CFP's SOP;
  - that the elevator was out of compliance with safety regulations; and
  - that CFP's supervisors were aware that the elevator was unsafe and deadly, but had done nothing to address this fact.
- That CFP's SOP for lowering the freight on the day of the incident that injured and ultimately killed Michael was inherently unsafe;
- That there existed no telephone or other mechanism between the second floor and the first floor to advise the receiving employee on the first floor that the load was ready to descend;
- That there existed no written or standardized method for CFP's SOP to be carried out;
- That Michael had never before undertaken the task of loading product on the elevator on the second floor for descent to the first floor;
- That Michael had not been trained on CFP's (inadequate and unsafe) SOP;
- That Michael had not been given any training on any aspect of the manner by which CFP employees carried out their duties in moving freight from the second

RANDALL K. EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE. 700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

floor to the first floor;

- That Michael was unaware of the unsafe and hazardous condition of the elevator.

66. Notwithstanding his knowledge and expectation that Michael would be injured or killed, Michael's supervisor, Dave Shomer, and/or other supervisors at CFP, assigned him to the task of loading the elevator with the intent that Michael be injured or killed as a result thereof, and that Michael's injury and death were certain to occur as a result of the actions and omissions of Shomer, and/or other supervisors at CFP.

67. At all times, Dave Shomer, and/or other supervisors at CFP, was acting within the course and scope of his/their duties as employee(s) of CFP, which is fully liable for the injuries and death that resulted from the actions and omissions of Dave Shomer, and/or other supervisors at CFP, as set forth above.

68. Upon information and belief, GRAIN CRAFT is also fully liable for the injuries and death that resulted from the actions and omissions of Dave Shomer, and/or other supervisors at CFP, as set forth above.

69. CFP and GRAIN CRAFT are liable for the actions of Shomer, and/or other supervisors at CFP and its other supervisors who intended that Michael would be injured or killed, in that:

- The conduct of Shomer, and/or other supervisors at CFP, was of the general kind he/they were employed to perform for CFP (and, by extension, GRAIN CRAFT);
- The conduct of Shomer, and/or other supervisors at CFP, occurred within the hours of his/their work and within the ordinary spatial boundaries of his/their employment for CFP (and, by extension, GRAIN CRAFT); and
- The conduct of Shomer, and/or other supervisors at CFP, was motivated by the purpose of serving the interests of CFP (and, by extension, GRAIN CRAFT).

70. As a result of the actions of Shomer, and/or other supervisors at CFP, acting on behalf of CFP and GRAIN CRAFT, Michael was injured and killed, which injuries and death caused damage to Michael, as represented by his estate, and his heirs, for which CFP and GRAIN CRAFT are liable, in an amount to be proved at trial.

- 12 -

71. The actions of Defendants CFP and GRAIN CRAFT, and each of them, were wanton, oppressive, malicious, and exhibited and manifested an intentional, knowing and reckless indifference or disregard for Michael's rights.

72. As a result, Plaintiffs are entitled to recover from Defendants CFP and GRAIN CRAFT, and each of them, punitive and exemplary damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

### (AGAINST CFP AND GRAIN CRAFT)

73. Plaintiffs hereby incorporate the averments of the foregoing paragraphs as though fully set forth at this point.

74. CFP and GRAIN CRAFT – as employer of Michael, and as the entity that created the hazard and risk to Michael, and as the controller of the information concerning the hazardous and unsafe condition of the elevator, as well as the hazardous and unsafe status of the SOP, as set forth above – owed a duty of care to Michael to train him about, warn him about, instruct him about and ensure that he avoided and was shielded from, said hazardous and unsafe conditions and customs and practices, and to minimize and remedy the dangers and hazards.

75. CFP and GRAIN CRAFT willfully, knowingly and intentionally failed to train, warn and instruct Michael about, and ensure that he avoided, said hazardous and unsafe conditions and customs and practices, and further failed to minimize and remedy the dangers and hazards.

76. As a result of the actions of CFP and GRAIN CRAFT as set forth in this claim for relief, Michael was injured and killed, which injuries and death caused damage to Michael, as represented by his estate, and his heirs, for which CFP and GRAIN CRAFT are liable, in an amount to be proved at trial.

77. The actions of Defendants CFP and GRAIN CRAFT, and each of them, were wanton, oppressive, malicious, and exhibited and manifested an intentional, knowing and reckless indifference or disregard for Michael's rights.

78. As a result, Plaintiffs are entitled to recover from Defendants CFP and GRAIN CRAFT,

- 13 -

and each of them, punitive and exemplary damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**(AGAINST CFP AND GRAIN CRAFT)**

79.  Plaintiffs hereby incorporate the averments of the foregoing paragraphs as though fully set forth at this point.

80.  The actions of Defendants CFP and GRAIN CRAFT, and each of them, were outrageous and intolerable in a civilized society, such as to offend the standards of decency and morality of the citizens of the State of Utah.

81.  Defendants CFP and GRAIN CRAFT, and each of them, acted willfully, intentionally and knowingly, and showed a reckless disregard for the physical and emotional health of Michael and his heirs, and intended to cause emotional distress to Michael and his heirs.

82.  Michael and his heirs suffered severe or extreme emotional distress, which was proximately caused by the outrageous conduct of CFP and GRAIN CRAFT, as a result of which Plaintiffs are entitled to recover from Defendants CFP and GRAIN CRAFT, and each of them, damages in an amount to be determined at trial, no less than $300,000.

83.  In addition, the actions of Defendants CFP and GRAIN CRAFT, and each of them, were wanton, oppressive, malicious, and exhibited and manifested an intentional, knowing and reckless indifference or disregard for Michael's rights, as a result of which Plaintiffs, and each of them, are entitled to recover from Defendants CFP and GRAIN CRAFT, and each of them, punitive and exemplary damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**

**(AGAINST THYSSEN KRUPP)**

84.  Plaintiffs hereby incorporate the averments of the foregoing paragraphs as though fully set forth at this point.

85.  For a number of years prior to the incident that ultimately took Michael's life, CFP had had a contract with Thyssen Krupp Elevator Corporation to inspect the elevator and to notify CFP's staff of any and all safety and operation issues of the elevator.

86.  Thyssen Krupp carried out various safety inspections up through 2013 on the elevator.

- 14 -

RANDALL K. EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

87.  At the time that Thyssen Krupp carried out its safety inspections, its inspectors knew or should have known that the elevator was unsafe to be operated in the manner that CFP personnel operated it as part of their SOP, as outlined above.

88.  Thyssen Krupp's investigator also knew or should have known that there were inadequate safety mechanisms attendant to the elevator, including, but not limited to:

- the failure of any barrier or gate above the chest-high level that would keep a person from placing his head or other body part into the elevator open space in such a way that it could become caught and entangled in a descending or ascending elevator;

- the lack of any presence-sensing device or other sensor that might halt elevator operations in the event that an employee's body might be inadvertently caught in an unsafe position on the elevator; and

- the fact that the hinged ceiling portion of the elevator had been screwed shut and thus created a "pinch point" in the event that a person from outside the elevator could trap his head or other body part in the event that it was caught in the event that the elevator ascended or descended while the person's body part was within the elevator space.

89.  Notwithstanding the knowledge of Thyssen Krupp's safety inspectors of the unsafe condition of the elevator, as used and as it had been modified, Thyssen Krupp did nothing to report, repair or otherwise remedy the unsafe condition of the elevator.

90.  In carrying out their inspections, Thyssen Krupp's safety inspectors owed a duty to Michael to undertake such inspections in such a way that safety hazards on the elevator would be identified, and that such hazards would be remedied.

91.  Thyssen Krupp breached its duties to Michael, which breach caused injuries and death to Michael, damaging him, as represented by his estate, and his heirs, in an amount to be proved at trial.

RANDALL K. EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

**FIFTH CLAIM FOR RELIEF**

**(AGAINST THYSSEN KRUPP)**

92.  Plaintiffs hereby incorporate the averments of the foregoing paragraphs as though fully set forth at this point.

93.  Thyssen Krupp knew or should have known or realized that its conduct and omissions bore an unreasonable risk of emotional distress on the part of Michael, or any other employee injured as a result of Thyssen Krupp's negligence, and that in such an event such emotional distress, would result in illness or bodily harm to Michael or any other employee injured as a result of Thyssen Krupp's negligence, as well as the heirs of Michael or any other employee killed as a result of Thyssen Krupp's negligence.

94.  Michael suffered severe emotional distress as a result of the negligence of Thyssen Krupp, which caused damages in an amount to be determined at trial.

95.  Michael's heirs have suffered severe emotional distress as a result of the negligence of Thyssen Krupp, which caused them damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**

**(AGAINST THYSSEN KRUPP)**

96.  Plaintiffs hereby incorporate the averments of the foregoing paragraphs as though fully set forth at this point.

97.  For a number of years prior to the incident that ultimately took Michael's life, CFP had had a contract with Thyssen Krupp Elevator Corporation to inspect the elevator and to notify CFP's staff of any and all safety and operation issues of the elevator.

98.  Michael, as an employee of CFP intended to be benefited and protected as a result of the contract between Thyssen Krupp and CFP, and having enforceable rights thereunder, was a third party beneficiary of that contract.

99.  Thyssen Krupp carried out various safety inspections up through 2013 on the elevator.

100. At the time that Thyssen Krupp carried out its safety inspections, its inspectors knew or should have known that the elevator was unsafe to be operated in the manner that CFP personnel operated it as part of their SOP, as outlined above.

- 16 -

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

101. Thyssen Krupp's investigator also knew or should have known that there were inadequate safety mechanisms attendant to the elevator, including, but not limited to:

- the failure of any barrier or gate above the chest-high level that would keep a person from placing his head or other body part into the elevator open space in such a way that it could become caught and entangled in a descending or ascending elevator;

- the lack of any presence-sensing device or other sensor that might halt elevator operations in the event that an employee's body might be inadvertently caught in an unsafe position on the elevator; and

- the fact that the hinged ceiling portion of the elevator had been screwed shut and thus created a "pinch point" in the event that a person from outside the elevator could trap his head or other body part in the event that it was caught in the event that the elevator ascended or descended while the person's body part was within the elevator space.

102. Notwithstanding the knowledge of Thyssen Krupp's safety inspectors of the unsafe condition of the elevator, as used and as it had been modified, Thyssen Krupp did nothing to report, repair or otherwise remedy the unsafe condition of the elevator.

103. In carrying out their inspections, Thyssen Krupp's safety inspectors breached their contractual duties to Michael, as a third-party beneficiary to the contract, which breach caused injuries and death to Michael, damaging him, as represented by his estate, and his heirs, in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

AS AGAINST CFP AND GRAIN CRAFT:

1. For damages for Michael's injuries, including pre-death pain and suffering, in an amount to be proved at trial, as set forth herein;

2. Damages in an amount that will fully and fairly compensate Michael's heirs for their losses, injuries and damages which are reasonable in the premises, as proved at trial,

RANDALL K.
EDWARDS
ATTORNEY AT LAW
136 S. MAIN, STE.700
SLC, UT 84101

COMPLAINT AND JURY DEMAND

as set forth herein;

3. Punitive and exemplary damages in an amount to be determined at trial, as set forth herein;

AS AGAINST THYSSEN KRUPP:

4. Damages for Michael's pre-death injuries, including pain and suffering, in an amount to be proved at trial, as set forth herein;

5. Damages in an amount that will fully and fairly compensate Michael's heirs for their losses, injuries and damages which are reasonable in the premises, as proved at trial, as set forth herein;

6. Damages for breach of contract, and all consequential damages resultant therefrom, as proved at trial, as set forth herein;

AS AGAINST ALL DEFENDANTS:

7. For such further relief which, to this court, appears just and equitable.

**JURY DEMAND**

Plaintiffs demand trial by jury of all claims and causes set forth herein.

DATED this 21st day of July, 2016.

RANDALL K. EDWARDS, PLLC
JEANNE D. MARSHALL, PLLC

*/s/ Randall K. Edwards*
by: Randall K. Edwards

- 18 -

COMPLAINT AND JURY DEMAND